**ASSOCIATION OF AMERICAN PHYSICIANS AND SURGEONS, INC.,
et al., Plaintiffs,**

v.

**Hillary Rodham CLINTON,
et al., Defendants.**

No. Civ.A. 93–0399 RCL.

United States District Court,
District of Columbia.

Dec. 18, 1997.

As Amended Dec. 22, 1997.

Thomas Roy Spencer, Spencer & Klein, P.A., Miami, FL, Robert C. Gill, II, Slavit & Gill, P.C., Washington, DC, for Plaintiffs.

Thomas Millet, Frank W. Hunger, Asst. Atty. Gen., John A. Rogovin, Deputy Asst. Atty. Gen., Dennis G. Linder, Douglas Letter, David M. Souders, Margaret S. Hewing, U.S. Dept. of Justice, Civ. Div., Washington, DC, for Defendants.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This matter comes before the court for what is hopefully the final time, for a determination of sanctions and attorney's fees and costs sought by plaintiffs.

There were three plaintiffs in this case. The Association of American Physicians and Surgeons, Inc. ("AAPS"), filed an application on January 5, 1995, for assessment of attorney's fees, costs, and sanctions, it had incurred pursuing this litigation in the amount of $374,070.14. AAPS noted, however, that $53,783.71 billed by previous counsel was still being disputed.

AAPS claims to be the prevailing party in this litigation, and seeks fees and costs pursuant to the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412, arguing that the position of the United States was not substantially justified. EAJA sets a statutory cap on the hourly rate that the court may award in attorney's fees. AAPS also seeks fees and costs for what they allege is sanctionable bad faith conduct in this litigation by defendants and their counsel. The EAJA statutory hourly rate cap would not apply to fees awarded for bad faith conduct.

### Background of this Litigation

This case was filed on February 24, 1993, regarding whether the President's Task Force on National Health Care Reform and its working groups were advisory committees for purposes of the Federal Advisory Committee Act. This court granted a preliminary injunction on March 10, 1993, finding that because the First Lady, Hillary Rodham Clinton, was not an officer or employee of the United States, the Task Force could not qualify for an exemption from the Federal Advisory Committee Act as an advisory group composed solely of "full-time officers or employees" of the government. As to the working group, this court concluded that it was engaged in fact-gathering and did not provide advice directly to the President, based on a sworn declaration dated March 3, 1993, by Ira C. Magaziner, Senior Advisor to President Clinton. *See AAPS v. Clinton,* 813 F.Supp. 82 (D.D.C.1993). In response to an inquiry from the court in connection with the pending motion, defendants have advised the court that this Magaziner declaration was prepared by the White House Counsel's office, specifically by Stephen Neuwirth under

guidance from Vincent Foster and Beth Nolan. The draft was revised, according to defendants, by Mr. Foster, Ms. Nolan, Mr. Magaziner and his staff at the White House. It was also reviewed by three attorneys in the Federal Programs Branch of the Justice Department's Civil Division, and by Associate Attorney General Webster Hubbell, before it was filed with this court, according to defendants.

An expedited appeal was taken from this court's ruling, and the appeal was argued on April 30, 1993. On June 22, 1993, a majority of a panel of the Court of Appeals found that the First Lady is the "functional equivalent" of a full-time federal officer or employee and that the Task Force was therefore exempt from the Federal Advisory Committee Act. As to the working group, the Court of Appeals found the record insufficient to determine whether FACA applied, and remanded for further proceedings, including expedited discovery, regarding the working group. *See AAPS v. Clinton,* 997 F.2d 898 (D.C.Cir. 1993).

Discovery thereafter was difficult, drawn-out, and contentious. In September, 1993, plaintiffs filed a motion to compel, which this court granted on November 9, 1993. This court found the government's discovery tactics were sanctionable, noting that certain responses were "preposterous," "incomplete," and "inadequate," and that defendants' objections were "meritless." Finding that defendants had "improperly thwarted plaintiffs' legitimate discovery requests," this court granted the motion to compel and ordered defendants to pay plaintiffs' costs and attorney's fees for the motion. *See* 837 F.Supp. 454 (D.D.C.1993). The defendants thereafter produced a great deal of information, but they still took no steps to correct Mr. Magaziner's sworn declaration that all working group members were federal employees.

Once discovery was completed, plaintiffs filed a motion for summary judgment on March 23, 1994. They listed the names of several hundred individuals they claimed were members of the working group who were not government employees. The defendants filed a cross-motion for summary judgment on May 4, 1994, and as the United States Attorney later pointed out, the government said in a footnote, for the first time since the remand from the Court of Appeals,

that it was not relying on the all-employee exception to the Federal Advisory Committee Act. The defendants then argued that the working group was so massive, fluid, and disorganized, that it lacked the structure, organization, and fixed membership that are essential to a FACA committee.

Plaintiffs responded with a motion on May 16, 1994, for sanctions and for contempt against Ira Magaziner.

On July 25, 1994, after a hearing, this court reserved ruling on the motion for contempt, and denied both motions for summary judgment and set the case for trial.

After settlement efforts failed, the defendants decided to moot the case by voluntarily releasing to the public all of the working group documents. Eventually, by Order of December 21, 1994, this court declared the case moot, and found the question of civil contempt of Mr. Magaziner to also be moot.

The court, however, indicated that the question of whether Mr. Magaziner should be held in criminal contempt of court for possible perjury and/or making a false statement when he signed his sworn declaration to this court on March 3, 1993, should be investigated by the United States Attorney for the District of Columbia.

On January 25, 1995, this court stayed consideration of attorney's fees and sanctions in this case pending resolution of the criminal contempt referral to the United States Attorney.

*The United States Attorney's Report*

United States Attorney Eric H. Holder, Jr., reported to the court that his investigation, carried out with the assistance of the Federal Bureau of Investigation, had included interviews of 35 witnesses, including former Associate Attorney General Webster Hubbell, former White House Counsel Bernard Nussbaum, and other current and former attorneys and others from the White House, the Department of Justice, and the working group, as well as the review of thousands of documents from the White House, the Justice Department, and elsewhere. The United States Attorney also conducted a five-hour interview of Mr. Magaziner, and re-

viewed a written submission by Mr. Magaziner's attorney, Charles F.C. Ruff.

The court filed the United States Attorney's report on August 4, 1995, and announced that the criminal investigation initiated by the court was now closed. The court vacated its stay of consideration of attorney's fees and sanctions, and set a status conference to schedule further proceedings. At the status conference, the court raised a number of questions which it directed the defendants to address, and defendants did so by memorandum filed October 5, 1995. In the meantime, by letter dated August 30, 1995, the United States Attorney sought to "clarify" his earlier letter, and this letter was filed by the court on September 1, 1995.

The United States Attorney noted the court's observation at the status conference that the thrust of his prior letter had been that "the government and the government's lawyers have misled or misrepresented facts to the court." The United States Attorney sought to clarify that he had not intended to imply that he had found a *willful or deliberate* attempt to mislead the court. (Emphasis supplied). He stated that "several mistakes or missteps by government counsel, coupled with certain aggressive or strained positions taken during discovery, led to the problems and concerns surrounding Mr. Magaziner's declaration." He noted that any misleading of the court "was the result not of any design to mislead the court, but rather of a combination of oversights, tactical misjudgments, and aggressive—perhaps, in hind sight, overly so—advocacy in the context of a hard-fought civil litigation." He went on to note that the key words in the Magaziner declaration—such as "member," "consultant," and "special government employee"—were not the sort of terms that could be proven true or false, or that could support a perjury prosecution. Nevertheless, as the United States Attorney recognized, the court must make its own determination regarding the appropriateness of sanctions. While the evidence need not include proof beyond a reasonable doubt, the court finds clear and convincing evidence that sanctions should be imposed because of the government's misconduct in this case.

On the question of the truthfulness of the Magaziner declaration, the United States Attorney reported that the "declaration as drafted clearly implies that consultants are a category completely distinct from that of special government employees." He further observed that the "terms used in the declaration were used loosely and inconsistently among and between the different agencies, and not everyone agreed in their definitions." The court concludes that Mr. Magaziner and his staff and the government's lawyers were not so blind and uninformed that they did not know those facts when the declaration was filed with the court. As the United States Attorney found, "There were people from outside the government doing what appeared to be volunteer work and filling out no employment paperwork, yet being classified as employees for purposes of the litigation." It is beyond a "strained interpretation," it is dishonest to argue to this court that people are employees when there was never a piece of paper created that said they were employees—with or without pay.

The court accepts the United States Attorney's determination that there is not proof beyond a reasonable doubt that Mr. Magaziner intended to mislead the court when he signed his declaration on March 3, 1993. Nevertheless, the court is convinced that Mr. Magaziner, and the drafters of his declaration, in an effort to avoid discovery and block live testimony, improperly represented as a fact that all "members" of the working group were federal employees. That "fact" was not true, then or later, by any *reasonable* definition of the word "member". The basic problem that defendants still fail to recognize is that defendants *never* sought to correct or change this factual representation to the court until the summary judgment briefing. To say that the government did not really *rely* on that "fact", when it presented that "fact" to the court and never timely corrected it, is simply dishonest. Indeed, the government never sought to timely advise this court that it was not making the "all-employee" argument attributed to the government by the Court of Appeals and by plaintiffs. Indeed, as the United States Attorney reported, the government itself in its response to the contempt motion stated that it had in

fact made the "all-employee" argument a year earlier, and then *never* corrected this alleged error in which it conceded that it had made the argument that it now claims it never made. Defendants now lamely claim that these were new government counsel who incorrectly conceded this. The court concludes that fresh government counsel looked at the record and concluded exactly what this court had concluded—along with plaintiffs' counsel and the Court of Appeals—and exactly what defendants had wanted this court to conclude all along, that the government was seeking the "all-employee" exemption for the working group.

The United States Attorney noted that the "government's papers in the District Court and in its reply brief in the circuit contains a few references to the working group being comprised solely of federal employees. In neither forum, however, did the government expressly argue that the working group was a body that should be exempt from the Advisory Committee Act based solely on the all-employee exception." This court cannot accept that distinction. The government provided the all-employee facts to the court as a truthful statement of fact. It cannot now hide and say it never expressly argued that a consequence of that fact was that the all-employee exemption applied. After all, what was the point in providing that factual information to the court if it was not to have the court accept it as true and apply thereto the applicable law?

The court also notes that in its discovery opinion issued on November 9, 1993, this court stated that one of the tasks it faced was to inquire into the "truth of the government's claim that all members of the working group are full-time officers or employees of the government." 837 F.Supp. at 456. Defendants never contemporaneously told this court that they had made no such claim. The government therefore cannot be said to have dealt with this court in good faith.

The United States Attorney noted that when the government advised the court and plaintiffs for the first time in a footnote to their May 4, 1994, summary judgment memorandum, that they were not relying on the "all-employee" exemption, that the govern-

ment viewed this as simply a tactical litigation judgment. They made no effort to correct or supplement any earlier filings with the court. The United States Attorney reported that the "confusion generated by the terms used in the [Magaziner] declaration was exacerbated by positions taken by the government during discovery." Significantly, the United States Attorney found that "[a]ttorneys in the White House, however, appear to have been reluctant to file a supplemental declaration, or anything else that might suggest that the declaration, although accurate when filed, was no longer a complete description of the working group process." This failure to correct the record is clear evidence of the government's lack of good faith in dealing with the court and with plaintiffs' counsel. Indeed, the United States Attorney reported that the government then "persisted in an attempt to go back after the fact and make everyone who had been involved in the working group 'fit' into the original categories of the declaration." As the United States Attorney correctly concluded, this only led to the "strained interpretations" that were "ultimately unconvincing." This court finds they were more than unconvincing, they were untrue.

The United States Attorney noted that in a criminal case the government would have to prove beyond a reasonable doubt that Mr. Magaziner knew that the statements in his March 3, 1993, declaration were false when he made them, and that he intended to deceive the court. It is clear that Mr. Magaziner relied upon the advice of White House attorneys—including Vincent Foster, who is deceased and could not now testify as to any advice—and Associate Attorney General Webster Hubbell—now a convicted felon, whose credibility could be impeached. So the court cannot disagree with the assessment of the United States Attorney about the likelihood of a successful criminal prosecution. But the most outrageous conduct by the government in this case is what happened when it never corrected or up-dated the Magaziner declaration. That was a determination not made individually by Mr. Magaziner, but by the government through its counsel.

### The Fee Application

AAPS submitted with its fee application a balance sheet showing a net worth of $272,-742 on February 28, 1993, when this action was filed, and a statement that it had no paid employees and relied upon volunteer staff.

The second named plaintiff, the American Council for Health Care Reform, submitted a statement that it had incurred no fees or costs in connection with this litigation, and that it was not seeking any reimbursement. The Council also noted that it had only six employees, and that its net worth did not exceed $7,000,000.

The third plaintiff, the National Legal and Policy Center, also submitted a statement that it had incurred no fees or costs in this case, and was not seeking reimbursement, and noted that it had only one employee and a net worth not exceeding $7,000,000.

### Eligibility Under the EAJA

■ Defendants claim that AAPS is not a party eligible to receive attorney's fees and expenses under the EAJA. According to the statute, any association whose net worth exceeds $7,000,000 or whose size exceeds 500 employees at the time the civil action was filed is ineligible to receive an award as a prevailing party. 28 U.S.C. § 2412(d)(2)(B)(ii) (1994).

AAPS clearly satisfies these two criteria: it has a net worth below the $7,000,000 ceiling and employs less than 500 employees. Defendants contend, however, that since this lawsuit was brought on behalf of the members of AAPS, the court should aggregate the net worth and number of employees of all the members in order to determine the eligibility of AAPS under the EAJA. This court recently had occasion to squarely reject this argument, and the court finds its decision there to be controlling. *National Association of Manufacturers v. U.S. Department of Labor*, 962 F.Supp. 191 (D.D.C.1997), appeal pending (No. 97–5157, D.C.Cir.). Since this court finds that AAPS meets both the net worth and size limits, it is an eligible party under the EAJA.

### AAPS Is a Prevailing Party

Plaintiffs' purpose in bringing this case was to open to public view the Health Care Task Force and its working group. Part of the result of the litigation was that the Task Force itself virtually never met, and all work shifted to the working group. Eventually, after this court denied summary judgment motions in July 1994, and set this matter for trial, the United States decided to either settle or moot the case by making public all of the documents produced by the working group. This total capitulation by the United States necessarily results in the inescapable conclusion that plaintiffs prevailed in this litigation. All of these working group documents would be safely tucked away in the National Archives had it not been for this litigation. It is only because of this litigation that they are now available for inspection by members of the public. Plaintiffs prevailed.

### The Position of the United States in This Litigation Was Not Substantially Justified

The court has separately determined that the United States in this case did not act in good faith, and that its conduct is therefore sanctionable. This same conduct leads the court to conclude that the positions taken by the United States in this litigation were not substantially justified.

### Plaintiffs' Refusal to Settle

■ Defendants argue that the court should reduce any award because AAPS "engaged in conduct which unduly and unreasonably protracted the final resolution of the matter in controversy." 28 U.S.C. § 2412(d)(1)(E). Defendants argue that plaintiffs' refusal to settle the case in August, 1994, should therefore result in denial of all fees claimed for the period after termination of settlement discussions. Defendants correctly point out that the court at that time thought plaintiffs should settle, and Kent Masterson Brown, lead counsel for plaintiffs, recommended to his clients that they settle. Mr. Brown then very honorably withdrew as plaintiffs' counsel when they refused his advice. It turns out, however, that the defendants did not properly provide public access to all the files of the participants of the working groups, as they had offered in settlement. It took weeks of prodding by plaintiffs' new counsel, and in-

spections of produced material, to identify a number of discrepancies that led to further court hearings and orders before the court could finally declare the case was moot. Disallowing plaintiffs' fees for these efforts, which turned out ·to be quite . productive, would be totally improper, and the court rejects defendants'· request. Although the court finds that the government did start acting in good faith during this period, plaintiffs are still entitled·to recover their fees at EAJA rates for this period because the government was not substantially justified in the way it produced the materials it was claiming to produce. It took weeks of efforts and hearings between September and December 1994, before the government finally complied.

### Proposed Reductions for. Claims Lost

█ The court finds that applicability of the Federal Advisory Committee Act to the Task Force as opposed to the working groups of the Task force is not the sort of separate "claim" that should lead to a reduction of fees. Defendants contend that the plaintiffs did not succeed on one claim. The clear result of this litigation, however, was that the Task Force virtually never met, because of the controversy generated by this case, and all of the government's work shifted to the working groups. The legal research necessary for plaintiffs' counsel to perform cannot be discounted or dismissed on the basis that counsels' work was performed on separate, unsuccessful claims, and the court rejects defendants' request to deny all hours expended prior to the appeal, and to only grant 12% of the time expended on appeal.

Defendants also seek to deny fees for time spent litigating the issue of mootness. The problem with defendants' argument is that it took a great of effort and prodding by plaintiffs before defendants finally carried out their promises to produce the materials that would in fact make the underlying litigation moot. If the White House had timely produced all the records that it said it was producing in September, 1994, defendants could have prevailed on this argument. The record shows, however, that the White House

did *not* fulfill its promises of production until forced to do so, and the court rejects defendants' request to cut plaintiffs' hours for this work. Courts do not deny attorney's fees issue by issue; rather, denial is because of lack of success of totally segregable claims. There is no basis for the denial defendants seek here.

### The Final Fee Award Requested

AAPS modified its request in its reply brief to seek $365,641.19 as detailed in the Declaration of Dr. Jane Orient, the Executive Director of AAPS, which attached all bills actually paid by AAPS. Dr. Orient concedes that $5,202.92 of this amount (paid to Spencer and Klein in check No. 458) was not attributable to this case, so AAPS actually expended $360,438.27 in attorney's fees and costs for which it now seeks reimbursement. Since defendants were allowed to file a surreply, and to address all of plaintiffs' submissions, the court rejects defendants' position that the new material submitted with plaintiffs' reply memorandum should not be. considered.

### Conceded Reductions in the Award

Plaintiffs concede in their reply that defendants are entitled to a deduction for travel time of at least $1,845.00.

· Plaintiffs further concede that $33,981.00 in overhead charges should be deducted, less ordinary recoverable costs of $9,052.09 for duplicating and $2,610.82 for transcripts—a total of $11,662.81 of the original $33,981.00 claimed, leaving a conceded deduction of $22,318.19.

Plaintiffs also concede $10,000 should be deducted of the $11,328.75 entries for media and legislative time, but their arguments for any of this time is unsupported by the record, so a deduction of $11,328.75 is appropriate.

Plaintiffs also concede $2,353.75 should be deducted for miscellaneous . deductions, as well as $1,300 for duplication of effort in the entry of new counsel.

These six conceded deductions total $39,-145.69, leaving the final contested amount as $321,292.58.

## Other Reductions

The court refuses to accept defendants' request to deny all attorney's fees to plaintiffs but the court does agree that some additional reduction is required. *See Action on Smoking & Health v. C.A.B.*, 724 F.2d 211 (D.C.Cir.1984). *See also Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The court will discount by a set percentage—here, an additional 10%—the fees and costs sought. This will cover any additional time expended on political or legislative activities, excessive travel, time claimed for work on non-legal tasks, inadequately documented hours, and duplicative work. The $321,292.58 noted above will therefore be reduced to $289,163.32.

The court must observe that in a case like this where a fee-paying client has paid the attorney's fees and costs and is now seeking reimbursement, presumably any fees not reimbursed will be the responsibility of the client. Judicial scrutiny of the exercise of billing judgment need not be as exacting in such a case; after all, the market place and the availability of other lawyers provides some level of scrutiny by the client as the bills are paid—and requires some level of billing judgment as the bills are sent—that does not exist in most cases where attorney's fees are litigated in court.

## · *Failure to Litigate in Good Faith*

█ The Court of Appeals affirmed this court on the one prior occasion where this court granted an award of attorney's fees against the government for acting in "bad faith, vexatiously, wantonly, or for oppressive reasons." *See American Hospital Association v. Sullivan*, 938 F.2d 216 (D.C.Cir.1991), *citing Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). The United States has waived its sovereign immunity for attorney's fees and costs in cases where it acts in bad faith. *See* 28 U.S.C. § 2412(b).

The Court of Appeals noted that "the standard for a finding of bad faith is stringent." 938 F.2d at 220–221. This court finds the evidence is clear and convincing that the defendants acted in bad faith until August 1994, when they determined to settle or moot this case. The Court of Appeals also noted that its review of this court's determination of bad faith would be based on a "clearly erroneous" standard of review, not *de novo* as argued by the government in that case. *Id.*

Acting dishonestly, as the government did in this case, is *per se* acting in bad faith.

Accordingly, the hourly fee cap of EAJA does not apply to attorney's fees prior to August 1994.

## *Defendants' Return to Good Faith*

█ After the court denied defendants' motion for summary judgment and set the matter for trial, Assistant Attorney General Frank Hunger and Deputy Assistant Attorney General John Rogovin participated in a series of meetings with the court and with plaintiffs' counsel in an effort to settle this case. These discussions were conducted in good faith, and indeed a settlement was reached that was approved by defendants and recommended by plaintiffs' counsel and by the court to plaintiffs. When plaintiffs refused to settle, the defendants proceeded to give them all the relief they could have then obtained from the court, and ultimately the court concluded that the case was moot. Although there were a number of problems with producing all of the documents during this September to December 1994 period, the court has no doubt whatsoever that Mr. Hunger and Mr. Rogovin were acting in good faith, and they promptly moved to resolve every obstacle and carry out what they had promised to do. Accordingly, although plaintiffs are entitled to EAJA attorney's fees for the period starting in August, 1994, they are not entitled to the higher hourly rates they obtain during the period in which the court finds the defendants were not acting in good faith.

The court also specifically finds that the government's arguments on attorney's fees and sanctions are made in good faith, and again, plaintiffs' counsels' rates must be at the EAJA level.

Therefore, for all hours billed after August, 1994, the EAJA hourly rate caps apply.

Since defendants concede that Mr. Spencer's effective hourly rates are below EAJA

rates, this reduction means that the hourly rates of Slavit and Associates for August through December 1994 must be reducted to the EAJA cap. Howard Slavit had billed his time at $225 per hour; Robert Gill at $175 per hour; and Steven J. Wadyka at $160 per hour.

This court has previously held that the EAJA rate for work performed in 1993 was $119.37, and for work performed in 1994 was $122.35. *See Chen v. Slattery,* 842 F.Supp. 597 (D.D.C.1994).

The total of 53.60 hours for Slavit and Associates would total $6,557.96, at EAJA rates. This represents a reduction of $3,298.54, from the amount they billed their client, and further reduces the plaintiffs' award from the $289,163.32 to set forth above, to $285,864.78.

### Individual Responsibility

Plaintiffs seek sanctions against individual counsel as well as the government, but agree with defendants that the court would have to conduct a hearing and further proceedings in order to try to apportion responsibility among the various defendants and their counsel. Although this might save the taxpayer some of the burden the court today imposes, such proceedings would themselves become the sort of "satellite" litigation the courts should avoid in deciding questions of attorney's fees and costs. Moreover, it is clear that the decisions here were made at the highest levels of government, and the government itself is—and should be—accountable when its officials run amok. There were no rogue lawyers here misleading this court. The court agrees with plaintiffs that these were not reckless and inept errors taken by bewildered counsel. The Executive Branch of the government, working in tandem, was dishonest with this court, and the government must now face the consequences of its misconduct.

### Conclusion

The Department of Justice has a long tradition of setting the highest standards of conduct for all lawyers, and it is a sad day when this court must conclude, as did the United States Attorney in his investigation, that the Department of Justice succumbed to pressure from White House attorneys and others to provide this court with "strained interpretations" that were "ultimately unconvincing." This court goes further than the United States Attorney, however, because this court cannot agree that the Department of Justice never relied upon the "all-employee" exemption for the working group. Having been presented the "all-employee" facts in the Magaziner declaration, the Court of Appeals specifically found that defendants had made that argument. Neither the briefs on appeal, nor any transcript of the oral argument on appeal, was before this court. Yet the Department of Justice sat back and never told this court that it was not making, and had not made, such an argument, and never corrected any of the factual inaccuracies in the Magaziner declaration. The United States Attorney reported that this was a conscious decision because attorneys in the White House refused to allow any supplemental information to be provided to the court. It seems that some government officials never learn that the cover-up can be worse than the underlying conduct. Most shocking to this court, and deeply disappointing, is that the Department of Justice would participate in such conduct. This was not an issue of good faith word games being played with the court. The United States Attorney found that the most controversial sentence of the Magaziner declaration—"Only federal government employees serve as members of the interdepartmental working group"— could not be prosecuted under the perjury statute because the issue of "membership" within the working group was a fuzzy one, and no generally agreed upon "membership" criteria were ever written down. Therefore, the Magaziner declaration was actually false because of the implication of the declaration that "membership" was a meaningful concept and that one could determine who was and was not a "member" of the working group. This whole dishonest explanation was provided to this court in the Magaziner declaration on March 3, 1993, and this court holds that such dishonesty is sanctionable and was not good faith dealing with the court or plaintiffs' counsel. It was not timely corrected or supplemented, and this type of conduct is repre-

hensible, and the government must be held accountable for it.

The court adheres to its view, expressed at the August 11, 1995, hearing, that "it is remarkable that any United States Attorney would make comments to a court that are so sharply critical, frankly, of the government conduct of this litigation. . . ." The court adds that it is beyond remarkable, it is commendable, and it demonstrates adherence to the traditional role of the Department of Justice that justice be done rather than that a case be won at any cost. The elevation of United States Attorney Holder to be Deputy Attorney General is an encouraging and hopeful signal that this case was a rare aberration—never to be repeated in this court.

Plaintiffs' motion for attorney's fees and costs is granted. A separate order shall issue this date.

### ORDER

For the reasons set forth in an accompanying Memorandum Opinion, plaintiffs' motion for attorney's fees, costs, and sanctions against defendants is hereby **GRANTED.**

Defendants shall pay to the American Association of Physicians and Surgeons, Inc., the sum of $285,864.78.

**SO ORDERED.**