United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued November 12, 1998 Decided August 24, 1999

 No. 98-5048

 Association of American Physicians and Surgeons, Inc., 
 an Indiana not-for-profit corporation; 
 American Council for Health Care Reform, 
 a Virginia not-for-profit corporation; 
 National Legal & Policy Center, 
 a District of Columbia not-for-profit corporation, 
 Appellees

 v.

 Hillary Rodham Clinton, 
 wife of the President of the United States; 
 Donna E. Shalala, Secretary of the Department of 
 Health & Human Services, et al. 
 Appellants

 ---------

 

 No. 98-5049

 Association of American Physicians and Surgeons, Inc., 
 an Indiana not-for-profit corporation; 
 American Council for Health Care Reform, 
 a Virginia not-for-profit corporation; 
 National Legal & Policy Center, 
 a District of Columbia not-for-profit corporation, 
 Appellees

 v.

 Hillary Rodham Clinton, 
 wife of the President of the United States, et al.

 
 Ira C. Magaziner, White House Advisor, 
 Appellant

 Appeals from the United States District Court 
 for the District of Columbia 
 (No. 93cv00399)

 Jacob M. Lewis, Attorney, United States Department of 
Justice, argued the cause for appellants Hillary Rodham 
Clinton, et al. Frank W. Hunger, Assistant Attorney Gener-
al, and William Kanter and Michael S. Raab, Attorneys, 
United States Department of Justice, were on brief.

 Irvin B. Nathan, James L. Cooper and Nancy L. Perkins 
were on brief for appellant, Ira C. Magaziner.

 Thomas R. Spencer argued the cause for the appellees. 
Robert C. Gill was on brief.

 Before: Ginsburg and Henderson, Circuit Judges, and 
Buckley, Senior Circuit Judge.

 Opinion for the court filed per Curiam.

 Per Curiam: The appellants, officials of the Executive 
Branch of the United States Government, including presiden-
tial advisor Ira C. Magaziner, (collectively referred to as the 
government) challenge the district court's December 22, 1997 
award of attorney's fees to the appellees, Association of 
American Physicians and Surgeons, American Council for 
Health Care Reform and National Legal & Policy Center, 
(collectively referred to as AAPS). The court awarded fees 
under the common law on the ground that the government 
litigated in bad faith and under the Equal Access to Justice 
Act, 28 U.S.C. s 2412, (EAJA) on the ground that the govern-
ment's litigating position was not "substantially justified." 
Because we conclude the district court's bad faith findings are 
clearly erroneous, we reverse the fee award 
and remand for further consideration.

 I.

 AAPS filed this action on February 24, 1993 alleging that 
the government violated the Federal Advisory Committee 
Act, 5 U.S.C. app. II, ss 1-15, (FACA) by failing to file an 
advisory committee charter for the "President's Task Force 
on National Health Care Reform" (Task Force) and by 
denying access to meetings of both the Task Force and an 
"interdepartmental working group" overseen by Task Force 
member Magaziner. On March 3, 1993, in opposition to 
AAPS's motion for preliminary injunction, the government 
filed a declaration by Magaziner (Magaziner Declaration, 
Declaration) which averred, inter alia, that "[o]nly federal 
government employees serve as members of the interdepart-
mental working group." Joint Appendix (JA) 135. The 
Declaration explained that membership included approxi-
mately 300 "full-time, permanent employees, who work for 
the Executive office of the President, for federal agencies, for 
members of Congress or for Senate or House committees," 
and 40 "special government employees" who "have been 
employed by an agency or the Executive Office of the Presi-
dent for less than 130 days in a 365-day period, either with or 
without compensation." JA 135-37. In addition, the Decla-

ration noted that the working group had "retained a wide 
range of consultants, who attend working group meetings on 
an intermittent basis, either with or without compensation." 
JA 137.

 On March 10, 1993 the district court issued a memorandum 
opinion and order granting AAPS's preliminary injunction 
motion. AAPS v. Clinton, 813 F. Supp. 82 (D.D.C. 1993). 
The court held that the Task Force was an advisory commit-
tee and that it did not come within FACA's exemption for a 
"committee that is composed wholly of full-time, or perma-
nent part-time, officers or employees of the Federal Govern-
ment," 5 U.S.C. app. II, s 3(2)(iii), because First Lady Hillary 
Clinton, who chaired the Task Force, was not a federal 
employee. The court also concluded, however, that the work-
ing group was not a FACA committee because it worked on 
behalf of the Task Force and did not directly advise the 
President. See 813 F. Supp. at 88-89 (finding interdepart-
mental working group (1) "directly compares" to task forces 
found exempt from FACA in National Anti-Hunger Coali-
tion v. Executive Committee, 557 F. Supp. 524 (D.D.C.), aff'd, 
711 F.2d 1071 (D.C. Cir. 1983), because it performed purely 
"staff" functions and (2) "fully meets" regulatory exemption 
from FACA in 41 C.F.R. s 101-6.1004(k), which "exclude[s] 
from the Act's coverage '[m]eetings of two or more advisory 
committee or subcommittee members convened solely to 
gather information or conduct research for a chartered advi-
sory committee, to analyze relevant issues and facts, or to 
draft proposed position papers for deliberation by the adviso-
ry committee or a subcommittee of the advisory commit-
tee' ").

 On appeal this court reversed and remanded, concluding (1) 
"[t]he question whether the President's spouse is 'a full-time 
officer or employee' of the government is close enough for us 
properly to construe FACA not to apply to the Task Force 
merely because Mrs. Clinton is a member," AAPS v. Clinton, 
997 F.2d 898, 910-11 (D.C. Cir. 1993), (AAPS I) and (2) the 
record was insufficiently developed to determine whether all 
of the working group's members were full-time federal em-
ployees or whether the working group was sufficiently struc-

tured so as to constitute a committee under FACA, id. at 915. 
The court explained:

 When we examine a particular group or committee to 
 determine whether FACA applies, we must bear in mind 
 that a range of variations exist in terms of the purpose, 
 structure, and personnel of the group. Perhaps it is best 
 characterized as a continuum. At one end one can 
 visualize a formal group of a limited number of private 
 citizens who are brought together to give publicized 
 advice as a group. That model would seem covered by 
 the statute regardless of other fortuities such as whether 
 the members are called "consultants." At the other end 
 of the continuum is an unstructured arrangement in 
 which the government seeks advice from what is only a 
 collection of individuals who do not significantly interact 
 with each other. That model, we think, does not trigger 
 FACA.
 
Id. at 915.1 While the working group "seem[ed] more like a 
horde than a committee," this court also noted that it had 
been created "with a good deal of formality and [is] perhaps 
better understood as a number of advisory committees." Id. 
at 914.

 Taking its cue from this court's language in AAPS I, the 
government, in its first submission to the district court follow-
ing remand, adopted what came to be known as the "wander-
ing horde" theory of the case. Accordingly, the government 
proposed that discovery be limited to whether the working 
group's "structure, personnel and purpose" were such that it 
was a FACA committee, regardless whether it fell within the 

__________
 1 The AAPS I court rejected the district court's determination 
that the working group was not a FACA committee because its 
members acted merely as advisory staff to the Task Force and did 
not directly advise the President. The court reasoned that because 
the Task Force was not itself a FACA Committee, the working 
group was "the point of contact between the public and the govern-
ment" and could therefore not be exempt from FACA based on its 
subsidiary relationship to the Task Force. AAPS I, 997 F.2d at 
912-13.

full-time employee exemption. The discovery that followed 
was contentious and, in response to a motion to compel that 
AAPS filed, the district court set out what it viewed as the 
issues before it. The first issue was whether the "formality 
and structure of the working group ... [was such that] there 
are advisory committees within the working group, even if the 
working group itself is not an advisory committee." AAPS v. 
Clinton, 837 F. Supp. 454, 456 (D.D.C. 1993). Although, as 
we note below, the government had not argued that the 
working group was exempt from FACA because it was com-
posed only of full-time government employees, the other 
issues the district court thought relevant to discovery in-
volved the "truth of the government's claim that all members 
of the working groups are full-time officers or employees of 
the government." Id. The district court then issued an 
order (dated November 9, 1993) granting the motion to 
compel and holding AAPS entitled to sanctions against the 
government under Fed. R. Civ. P. 37, although no sanctions 
were ever assessed.

 On April 11, 1994 AAPS filed a summary judgment motion 
accompanied by a list of individuals who it claimed were 
members of the working group but who did not meet the 
requirements of FACA's federal employee exemption. The 
government filed a cross-motion for summary judgment on 
May 4, 1994 and argued that the working group was not a 
FACA "committee" because it lacked " 'an organized struc-
ture, a fixed membership, and a specific purpose' " and was 
not operated "with 'formality.' " Cross-Motion Memorandum 
at 2 (quoting AAPS, 997 F.2d at 914). In addition, the 
government stated in a footnote:

 Defendants do not argue here that the interdepartmental 
 working group qualified for the FACA's exemption for 
 groups comprised wholly of full-time federal employees. 
 As defendants have stated, the "members" of the work-
 ing group were either regular employees of the Execu-
 tive Branch or Congress or special government employ-
 ees. In light of the Court of Appeals' discussion of the 
 term "full-time," see AAPS I, 997 F.2d at 914-15, howev-
 
 er, it would be a substantial burden for defendants and 
 this Court to make a person-by-person assessment that 
 each such "member" worked "full-time." Because it is 
 clear that the interdepartmental working group and its 
 working groups lacked the features of FACA committees 
 identified by the court, it is not necessary for the defen-
 dants to attempt to prove the applicability of the FACA's 
 exemption in any event.
 
Id. at 2 n.1 (emphasis added).

 On May 16, 1994 AAPS moved to hold Magaziner in 
contempt for having "made false and misleading statements 
under penalty of perjury in his March 3, 1993 Declaration," 
5/16/94 Memorandum in Support of Motion for Sanctions and 
Rule for Contempt at 20, and for sanctions against the 
government for "defending the case by asserting facts they 
knew not to be true" (namely "that only full-time employees 
of the federal government ... were participants on the Task 
Force working groups"), id. at 18, 16, and for having "con-
stantly refused to comply with Plaintiff's discovery requests 
and [the district court's] November 9, 1993 Order compelling 
discovery," id at 18.

 At a hearing on July 25, 1994 the district court denied the 
cross-motions for summary judgment and reserved ruling on 
the contempt and sanctions motion. See JA 832-33. There-
after the government made the then defunct working group's 
documents available for inspection and as a consequence on 
December 21, 1994 the district court issued an order declar-
ing the merits, and the matter of civil contempt, moot. 
AAPS v. Clinton, 879 F. Supp. 106 (D.D.C. 1994). In the 
same order the court referred Magaziner's possible perjury 
and criminal contempt to the United States Attorney for the 
District of Columbia "for further development of the facts in 
order to determine whether a criminal offense has been 
committed." Id. at 108. The court also set a status confer-
ence "to schedule consideration of plaintiffs' collateral re-
quests for other sanctions and attorneys' fees and costs." Id. 
at 109.

 On August 3, 1995 then United States Attorney Eric H. 
Holder, Jr. wrote the district court a letter stating: "The 
results of our investigation demonstrate that there is no basis 
to conclude that Mr. Magaziner committed a criminal offense 
in this matter. There is no significant evidence that his 
declaration was factually false, much less that it was willfully 
and intentionally so." JA 1990. On August 30, 1995, after 
reading a transcript of an August 11 status conference, 
Holder again wrote the court, to "clarify" that he did not 
intend to imply in the August 3 letter that he had found "a 
willful or deliberate attempt to mislead the Court on the part 
of the government." JA 2031.2

 After additional briefing, the district court issued an order 
and opinion dated December 18, 1997 (as amended December 
27, 1997) finding the government's conduct "sanctionable" and 
awarding AAPS attorney's fees and costs of $285,864.78 both 
under the common law's "exception" to the "American rule" 
against attorney fees "where the losing party has acted in 
'bad faith,' " American Hosp. Ass'n v. Sullivan, 938 F.2d 216, 
219 (D.C. Cir. 1991) (citations omitted), and under the EAJA, 
which provides that "a court shall award to a prevailing party 
other than the United States fees and other expenses ... 
unless the court finds that the position of the United States 
was substantially justified or that special circumstances make 
an award unjust," 28 U.S.C. s 2412(d)(1)(A). The district 
court first found that Magaziner (as well as any staff and 
counsel who participated in drafting the Magaziner Declara-
tion) had acted in bad faith in four respects in making the all-
government-employee assertion. The court further found 
that the government acted in bad faith by failing (1) "to 
correct or change" Magaziner's "factual representation to the 
court" that "all 'members' of the working group were federal 
employees" or (2) to "timely advise t[he] court that it was not 
making the 'all-employee' argument attributed to the govern-

__________
 2 Holder wrote specifically in response to the district court's 
observation at the conference that " 'the thrust' " of Holder's Au-
gust 3, 1995 letter was "that 'the government and the government's 
lawyers have misled or misrepresented facts to the Court,' " JA 
2030 (quoting district court).

ment by the Court of Appeals and by plaintiffs." AAPS v. 
Clinton, 989 F. Supp. 8, 11 (1997). Having thus "separately 
determined that the United States in this case did not act in 
good faith, and that its conduct is therefore sanctionable," the 
district court stated that "[t]his same conduct leads the court 
to conclude that the positions taken by the United States in 
this litigation were not substantially justified." 989 F. Supp. 
at 13. Having found "that the defendants acted in bad faith 
until August 1994, when they determined to settle or moot 
this case," 989 F. Supp. at 15, the court awarded fees for 
work performed before that date in excess of the EAJA 
hourly cap,3 noting: "The Court of Appeals affirmed this 
court on the one prior occasion where this court granted an 
award of attorney's fees against the government for acting in 
'bad faith, vexatiously, wantonly, or for oppressive reasons,' " 
id. at 15 (citing American Hospital Ass'n v. Sullivan, 938 
F.2d 216 (D.C. Cir. 1991) (upholding fee award based on 
common-law exception, notwithstanding plaintiff was ineligi-
ble for any fee under EAJA s 2412(d)(2)(B))). The govern-
ment and Magaziner appeal the fee award and its underlying 
findings of bad faith.4

 II.

 We review an EAJA fee award for abuse of discretion and 
"will reverse the district court if its decision rests on clearly 
erroneous factual findings or if it leaves us with a definite and 
firm conviction that the court below committed a clear error 
of judgment in the conclusion it reached upon a weighing of 

__________
 3 When the sanctioned conduct occurred, the EAJA capped fee 
award rates at $75 per hour. See 28 U.S.C. s 2412(d)(2)(A) (1994). 
In 1996 the hourly cap was raised to $125. See Pub. L. No. 
104-121, s 232(b)(1), 110 Stat. 847, 863 (1996).

 4 AAPS disputes Magaziner's standing to appeal the findings of 
bad faith regarding the Magaziner Declaration. Because those 
findings underlie the district court's finding of bad faith by the 
government, whose standing is unchallenged, we must address them 
in any event to resolve the government's appeal. Accordingly, we 
need not decide whether Magaziner himself has standing.

the relevant factors." F.J. Vollmer Co. v. Magaw, 102 F.3d 
591, 595-96 (D.C. Cir. 1996). Similarly, "the question of bad 
faith in the context of the common law exception to the 
American rule on counsel fees ... is one of fact requiring a 
clearly erroneous standard of review." American Hosp. 
Ass'n v. Sullivan, 938 F.2d at 222. Nevertheless, the sub-
stantive standard for a finding of bad faith is "stringent" and 
"attorneys' fees will be awarded only when extraordinary 
circumstances or dominating reasons of fairness so demand." 
Nepera Chem., Inc. v. Sea-Land Serv., Inc., 794 F.2d 688, 702 
(D.C. Cir. 1986). Further, the finding of bad faith must be 
supported by "clear and convincing evidence," see Shepherd v. 
American Broadcasting Cos., Inc., 62 F.3d 1469, 1476-78 
(D.C. Cir. 1995), which "generally requires the trier of fact, in 
viewing each party's pile of evidence, to reach a firm convic-
tion of the truth on the evidence about which he or she is 
certain." United States v. Montague, 40 F.3d 1251, 1255 
(D.C. Cir. 1994). Because we find insufficient evidence in the 
record to satisfy the stringent bad faith standard, we hold 
that the district court's bad faith findings are clearly errone-
ous.

 We first conclude there is an inadequate basis for the 
court's finding that the government acted in bad faith by not 
"timely advis[ing]" the court that "it was not making the 'all-
employee' argument attributed to the government by the 
Court of Appeals and by plaintiffs." 997 F. Supp. at 11.

Assuming that the government affirmatively invoked the exemtion
in the district court as a defense of working group documents, a
fact that is not at all clear from the record 5 government informed the 
court, albeit in a footnote, in its May 4, 1994 memorandum in 
support of summary judgment, quoted supra pp. 6-7, that it 
was not claiming the federal employee exemption for the 
working group. At worst the government's failure to do so 
earlier demonstrates only that it wanted to keep its options 
open--and so it remained silent.
The government was under no "clear" duty before then 
to disavow it and therefore its silence, while apparently 
misleading, does not amount to bad faith. See American 
Hosp. Ass'n v. Sullivan, 938 F.2d at 222 ("[B]ad faith may be 
found where a party has violated a 'clear [legal] duty.' ") 
(Ginsburg, J., dissenting, quoting majority opinion, 938 F.2d 
at 219).

 We also find no bad faith in the government's failure "to 
correct or change" the Magaziner Declaration's representa-
tion to the court that all members of the working group were 
federal employees. Given that the government did not press 
the federal employee exemption, the representation, if false, 
was not material and therefore cannot be characterized as 
made in bad faith. Cf. Whitney Bros. Co. v. Sprafkin, 60 
F.3d 8, 14-15 (1st Cir. 1995) (rejecting "bad faith" finding 
based on alleged perjury where district court "neither ex-
plained why it concluded that the [defendants] had perjured 
themselves nor explained why any allegedly untrue state-
ments were material"). Further, this finding cannot stand 
because the district court's subsidiary findings of bad faith in 
drafting the Magaziner Declaration, on which the court rested 

__________
 5 The government's only explicit reference to the exemption's 
application to the working group was in a footnote in its March 3, 
1993 memorandum opposing temporary injunctive relief. See JA 
117 n.26 ("If plaintiffs are concerned that working group members 
have met with Mr. Magaziner, such meetings would not be covered 
by FACA. All working members, like Mr. Magaziner, are federal 
employees."). The Magaziner Declaration described the working group as made up exclusively
of "federal government employees" but it made no mention of the FACA federal employee
exemption and did not claim the employee members were "full-time, or permanent
part-time" government employees, a necessary element of the exemption.
the finding, are not supported by clear and convincing evi-
dence.

 The court first found that the Declaration "clearly implies 
that consultants are a category completely distinct from that 
of special government employees" but that Magaziner (as well 
as "his staff and the government's lawyers") must have 
known that those terms " 'were used loosely and inconsistent-
ly among and between the different agencies, and not every-
one agreed in their definitions.' " 989 F. Supp. at 11 (quoting 
8/3/95 Holder letter at 12 (JA 2000)). The court cited no 
evidence, however, that at the time the Declaration was 
drafted Magaziner disbelieved the distinction between em-
ployees and consultants (only the former of which he charac-
terized as working group "members") based on the degree of 
their participation or, alternatively, that such a distinction 
was objectively unreasonable. Cf. Whitney Bros. Co., 60 F.3d 
at 14 (rejecting bad faith finding based on "frivolous" defens-
es because district court did not explain "how these defenses 
are frivolous or why they were objectively or subjectively 
unreasonable at the time they were advanced"). In fact, in 
AAPS I, this court concluded that the level of the consultants' 
involvement was a "key issue" in determining whether the 
consultants were members of the working group, although it 
found there was insufficient record evidence then to resolve 
it. 997 F.2d at 915. We therefore cannot say that the 
Declaration's characterization of the "consultants" as "inter-
mittent" attendants at working group meetings, as distinct 
from the more frequently involved members (including special 
government employees), manifested bad faith. Cf. Johnson 
Controls, Inc. v. United Ass'n of Journeymen & Apprentices 
of Plumbing & Pipe Fitting Indus. of U.S. & Can., 39 F.3d 
821, 826 (7th Cir. 1994) (upholding denial of attorney's fee 
award because "this case presents at least a colorable ques-
tion of law" and court "c[ould] not conclude, therefore, that 
[the plaintiff's] arguments before the district court and on 
appeal were frivolous or in bad faith").

 Second, the district court found that the Magaziner Decla-
ration was "dishonest" in representing that "people are em-
ployees when there was never a piece of paper created that 

said they were employees--with or without pay." 997 
F. Supp. at 11. Again there is an insufficient basis for a bad 
faith finding. The Declaration did not claim employment 
paperwork had been created and there is no evidence in the 
record that Magaziner knew at the time of his Declaration 
whether it had been. He described a "special government 
employee" simply as one who had been "employed" by the 
government "for less than 130 days in a 365-day period, 
either with or without compensation," with no mention of 
employment formalities such as paperwork. As the govern-
ment notes, such paperwork, while perhaps the norm, is not a 
condition of special government employment as statutorily 
defined. See 18 U.S.C. s 202(a) ("[T]he term 'special Govern-
ment employee' shall mean an officer or employee of the 
executive or legislative branch of the United States Govern-
ment, of any independent agency of the United States or of 
the District of Columbia, who is retained, designated, appoint-
ed, or employed to perform, with or without compensation, 
for not to exceed one hundred and thirty days during any 
period of three hundred and sixty-five consecutive days, 
temporary duties either on a full-time or intermittent basis, a 
part-time United States commissioner, a part-time United 
States magistrate ...").

 Third, the district court found that the Declaration, "in an 
effort to avoid discovery and block live testimony, improperly 
represented as a fact that all 'members' of the working group 
were federal employees." 997 F. Supp. at 11. As we noted 
above, there is no clear and convincing evidence that the 
Declaration's drafters did not reasonably believe the repre-
sentation to be true when made.

 Fourth, the district court found bad faith in that the 
Declaration "was actually false because of the implication of 
the declaration that 'membership' was a meaningful concept 
and that one could determine who was and was not a 'mem-
ber' of the working group." 997 F. Supp. at 11. It is not 
clear on what basis the district court found that membership, 
either when the Declaration was written or through the life of 
the working group, was not a meaningful concept. Holder 
found only that membership was a "fuzzy" concept. In its 

discovery responses the government conceded simply that 
membership was not a "significant" or "operative" concept, 
but never that it was not meaningful (in the sense that one 
could not distinguish members from non-members). Al-
though the concept of membership may not have been crystal 
clear, it did have meaning--indeed, the district court applied 
the concept in choosing the government's list of 630 members 
over the list of 1000 alleged members presented by AAPS. 
See AAPS, 879 F. Supp. at 105. The Declaration may have 
given the impression that determining membership was easy; 
nevertheless, because there is insufficient evidence that, in 
distinguishing between members and non-members, the Dec-
laration's drafters intended to mislead the court, it was 
clearly erroneous for the court to find bad faith based on the 
distinction.

 For the preceding reasons, we hold that the district court's 
findings of bad faith, both in the Magaziner Declaration's 
drafting and in the government's litigation conduct, are with-
out clear and convincing evidentiary support and that the 
attorney's fee award therefore cannot be upheld insofar as it 
rests on bad faith. We further hold that the court's award 
cannot be sustained under the EAJA on the basis that the 
government's litigation position was not substantially justified 
because the court expressly based the award on its predicate, 
and inadequately supported, bad faith findings. Accordingly, we re-
verse the attorney's fee award and remand for further consid-
eration by the district court. While our decision forecloses an 
award based on the government's alleged assertion of the 
federal employee exemption (whether for bad faith or under 
the EAJA), the district court may, if it finds the evidence so 
warrants, award fees under the EAJA or Fed. R. Civ. P. 11 
based on another asserted defense (such as the government's 
argument that the working group was not a FACA committee 
because it "d[id] not offer advice or recommendations directly 
to the President," JA 120, which the record suggests may not 
be true, see, e.g., JA 2262). In addition or in the alternative, 

the district court may consider assessing the sanctions (under 
Fed. R. Civ. P. 37) to which the court found AAPS was 
entitled in its November 9, 1993 order granting AAPS's 
motion to compel. See AAPS, 837 F. Supp. at 354.

 So ordered.